IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-00631-PAB-NRN

CHRISTOPHER ERIC MASTERS,

      Plaintiff,

v.

SAFECO INSURANCE COMPANY OF AMERICA,

      Defendant.

---

## ORDER

---

      This matter is before the Court on Plaintiff's Motion to Strike Certain Opinions of John Palmeri [Docket No. 29], Defendant's Motion to Exclude Testimony of Plaintiff's Legal Expert, Damian Arguello [Docket No. 30], Defendant's Motion to Exclude Testimony of Treating Physician Jack Rentz, M.D. Concerning Future Medical Care [Docket No. 31], and Defendant's Motion to Exclude Testimony of Economist Mark Guilford Concerning Future Medical Expenses [Docket No. 32].  The parties responded to each of these motions, Docket Nos. 36, 35, 33, 34, respectively, and replied.  Docket Nos. 37, 40, 38, 39.

## I.  BACKGROUND

      The Court assumes the parties' familiarity with the background facts of this case and will not repeat them except as necessary to resolve this motion.  Additional background may be found in the order on the parties' motions for summary judgment.  *See* Docket No. 54 at 1–7.

Plaintiff's operative complaint states claims for breach of contract as well as common-law and statutory bad faith.  *Id.* at 7–9, ¶¶ 57–85.  The parties both filed motions for summary judgment on the bad faith claims.  Docket Nos. 41, 42.  The Court dismissed the portion of plaintiff's statutory bad faith claim concerning lost wages and found plaintiff's claims for medical expenses and general damages survive summary judgment.  Docket No. 54 at 13.  The Court also dismissed plaintiff's common-law bad faith claim.  *Id.* at 27.

Plaintiff has filed a motion to exclude testimony of defendant's legal expert, John Palmeri, under Federal Rule of Evidence 702.  Docket No. 29.  Defendant has filed three motions to exclude testimony, concerning (1) Damian Arguello, plaintiff's legal expert, under Rule 702, Docket No. 30; (2) Dr. Jack Rentz, plaintiff's treating physician, under Rule 702 and Federal Rule of Civil Procedure 26(a)(2), Docket No. 31; and (3) Mark Guilford, plaintiff's expert on future medical expenses, under Rule 702.  Docket No. 32.  The Court considers these motions in turn.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Evidence 702

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an

expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[] a two-step analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the proffered opinions must be assessed for reliability.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

In ruling on a Rule 702 motion, the district court has a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  Where an expert witness relies on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes."  *Daubert*,

509 U.S. at 597.  It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cnty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe*, 556 F. Supp. 2d at 1221.

Assuming the standard for reliability is met, the Court must ensure that the proffered testimony will assist the trier of fact.  *See Kumho Tire*, 526 U.S. at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006).  "Relevant expert

testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). In assessing whether expert testimony will assist the trier of fact, a court should consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

Finally, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### B.  Federal Rule of Civil Procedure 26(a)(2)

Federal Rule of Civil Procedure 26(a) governs the requirements for disclosure of witnesses.  Rule 26(a)(2)(B) provides that if a "witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," the party offering the witness must supplement its disclosure with an expert report.  For other witnesses, Rule 26(a)(2)(C) applies and the disclosure need only state "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).

Treating physicians are typically designated as non-retained and therefore are

not subject to Rule 26(a)(2)(B)'s report requirement.  *See Davis v. GEO Grp.*, No. 10-cv-02229-WJM-KMT, 2012 WL 882405, at *2 (D. Colo. Mar. 15, 2012).  However, "it is the substance of the expert's testimony, not the status of the expert, which will dictate whether a Rule 26(a)(2)(B) report will be required."  *Trejo v. Franklin*, No. 04-cv-02523-REB-MJW, 2007 WL 2221433, at *2 (D. Colo. July 30, 2007) (internal quotation marks and brackets omitted).  For example, a treating physician may properly testify about his "observations, diagnosis and treatment of a patient," i.e., "what he said and did and why he did it" – without submitting an expert report.  *Davis*, 2012 WL 882405, at *2.  On the other hand, if the physician opines as to issues of "causation, prognosis, or future disability" going beyond his personal observation or treatment of the patient, or "review[s] the records of another health care provider in order to formulate [an] opinion on the appropriateness of care," the witness will be considered "retained or employed" and will be required to file a written report under Rule 26(a)(2)(B).  *Id.*; *see also Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734–35 (7th Cir. 2010) (holding that "a treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2)).

To determine whether the requirements of Rule 26(a)(2) have been satisfied, courts apply a burden-shifting framework.  *See Davis*, 2012 WL 882405, at *2; *see also Morris v. Wells Fargo Bank, N.A.*, No. 09-cv-02160-CMA-KMT, 2010 WL 2501078, at *2

(D. Colo. June 17, 2010) ("[S]ome showing must be made to distinguish an expert witness not required to provide a report under Rule 26(a)(2)(B) from the vast majority of cases where experts are required to provide a report.").  The party moving to strike the witness must first show that the disclosing party was required to produce a written report under Rule 26(a)(2)(B).  *Davis*, 2012 WL 882405, at *2.  The burden then shifts to the party who disclosed the witness to show that a report was not required.  *Id.*

## III.  ANALYSIS

As an initial matter, the Court notes that, in some cases, such as insurance bad faith cases, expert witnesses are permitted to testify about relevant legal standards. "[A]n expert's testimony is not *per se* inadmissible simply because it requires discussion of the law."  *Amica Life Ins. Co. v. Wetz*, No. 15-cv-1161-WJM-CBS, 2017 WL 897839, at *3 (D. Colo. Mar. 7, 2020).  "[A] witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."  *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988).  Such testimony "is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function.  However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed."  *Id.* at 809–10.  Testimony that "articulates the ultimate principles of law governing the deliberations of the jury" is inadmissible.  *Id.* at 808.  While an expert may refer to the law in expressing his or her opinion, the expert "may not state legal conclusions drawn by applying the law to facts." *A.E. ex rel. Evans v. Indep. Sch. Dist*. No. 25, 936 F.2d 472, 476 (10th Cir. 1991)

7

(citations omitted).

An expert, therefore, may testify as to insurance industry standards codified in Colorado and ones that are generally accepted within the Colorado insurance industry. Nevertheless, while an expert is permitted to testify as to insurance industry standards, and may testify that defendant's conduct did or did not conform with those standards, an expert may not apply legal standards from caselaw or statutes to state an opinion that defendant's conduct actually violated or complied with caselaw or statutes. *See O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 928 (D. Colo. 2017) (permitting insurance expert to offer opinions on defendant's compliance with relevant industry standards but not permitting expert to opine on whether the insurance company met legal standard for liability). An expert is not permitted to "state legal conclusions drawn by applying the law to facts," *A.E. ex rel. Evans*, 936 F.2d at 476, because "such ultimate conclusions would not be helpful to the jury and would improperly intrude on its fact-finding function." *O'Sullivan*, 233 F. Supp. 3d at 929 (excluding opinions that an insurance company's conduct violated the law). Therefore, an expert may not opine whether defendant met its duties under applicable caselaw. An expert may, however, testify whether, in the expert's opinion, defendant's conduct conformed with specific insurance industry standards, including standards identified by statute, and the expert may compare those standards to specific factual instances of defendant's actions. *See Dale v. Country Preferred Ins. Co.*, No. 19-cv-01991-PAB-SKC, 2021 WL 1172574, at *3 (D. Colo. Mar. 29, 2021); *see also O'Sullivan*, 233 F. Supp. 3d at 928 (ruling that expert could offer opinions whether defendant's conduct "differed, in factual terms, from

8

the practices of other insurers" or from "relevant industry practices and standards," but could not opine about whether defendant's conduct "was unlawful or 'egregious'"); *Houston Speciality Ins. Co. v. Vaughn*, 2017 WL 11415011, at *3 (M.D. Fla. Apr. 13, 2017) (permitting an insurance expert to (1) "explain[] what she knows of insurance industry standards, (2) "explain[] the facts and evidence she reviewed in the case," and (3) "opin[e] on the ways she believes [the insurer's] conduct fell short of" those standards).

### A. John Palmeri

Plaintiff moves to strike three opinions of Mr. Palmeri under Rule 702 to "prevent Mr. Palmeri from providing inaccurate or false descriptions of the state of the law in Colorado." Docket No. 29 at 2. The opinions that plaintiff seeks to exclude are (1) Mr. Palmeri's suggestion that physical impairment and disfigurement are not separate or distinct from non-economic losses; (2) that the "fairly debatable" standard is conclusive as to plaintiff's bad faith claims; (3) that *State Farm Mut. Auto. Ins. Co. v. Fisher*, 418 P.3d 501 (Colo. 2018), does not apply to defendant's pre-litigation conduct. *Id.*[1]

#### 1. Physical Impairment, Non-Economic Loss, and General Damages

First, plaintiff argues that Mr. Palmeri's opinion that it was inappropriate for plaintiff's counsel to distinguish physical damage and disfigurement is incorrect because Mr. Palmeri based this contention on an opinion by Justice Coats in *Pringle v.*

---

[1] Plaintiff also seeks to exclude Mr. Palmeri from testifying that using plaintiff's net income from his 2017 tax return was the sole appropriate method of evaluating his claim for lost earnings. *Id.* The Court does not consider this argument because the Court has found defendant entitled to summary judgment on the portion of plaintiff's statutory bad faith claim concerning lost wages. *See* Docket No. 54 at 13.

*Valdez*, 171 P.3d 624 (Colo. 2007), which was not the majority opinion.  *Id.* at 3.[2]  Mr. Palmeri stated that defendant's "evaluation of plaintiff's general damages was reasonable.  Plaintiff's counsel had drawn a distinction regarding claims for physical impairment and disfigurement.  This distinction, however, does not exist in common law tort claims."  Docket No. 29-1 at 15 (citing *Pringle*, 171 P.3d at 632–33).  Mr. Palmeri continued, quoting Justice Coats, "'[n]othing in the pre-statutory law of this jurisdiction suggests a variance from the generally accepted treatment of physical impairment and disfigurement as types of non-economic loss for which recovery might be had in tort action.'  Accordingly, [defendant's] evaluation of plaintiff's general damages was reasonable and appropriate."  *Id.* (quoting *Pringle*, 171 P.3d at 632).  Plaintiff argues that permitting Mr. Palmeri to make such an inaccurate statement at trial would be unhelpful and confusing to the jury because the majority opinion in *Pringle* made clear that, "[u]nder Colorado common law, damages for physical impairment and disfigurement have historically been recognized as a separate element of damages." *Pringle*, 171 P.3d at 631.

In response, defendant argues that, in fact, it did include non-economic damages in its evaluation of plaintiff's claim, and the term "general damages" includes both non-economic loss and impairment.  Docket No. 36 at 3.  Defendant also argues that the objection regarding Mr. Palmeri's citation to a dissent in *Pringle* is "misplaced" because *Pringle* dealt with a "statutory seatbelt defense," which is not at issue here.  *Id.* at 5.

The Court agrees with plaintiff that Mr. Palmeri's statement, drawn from Justice

---

[2] In *Pringle*, Justice Coats, joined by Justice Eid, filed a separate opinion concurring in part and dissenting in part.

Coats's opinion, should be excluded.  Defendant may introduce evidence that it

considered non-economic damages in its evaluation of plaintiff's claim and that, to

defendant, the term "general damages" means both non-economic loss and

impairment.  *See* Docket No. 36 at 6.  However, Mr. Palmeri's opinions that "[n]othing in

the pre-statutory law of this jurisdiction suggests a variance from the generally accepted

treatment of physical impairment and disfigurement as types of non-economic loss for

which recovery might be had in tort action," Docket No. 29-1 at 15 (quoting *Pringle*, 171

P.3d at 632), and that, therefore, defendant's "evaluation of plaintiff's general damages

was reasonable and appropriate" would not help the jury to evaluate whether defendant

did, in fact, consider both plaintiff's non-economic and impairment damages.  *Id.*

Moreover, while Mr. Palmeri may testify as to insurance industry standards, and may

testify that defendant's conduct conformed with those standards, he may not apply legal

standards from caselaw to state an opinion that defendant's conduct actually violated or

complied with caselaw.  This is because an expert is not permitted to "state legal

conclusions drawn by applying the law to facts," *A.E. ex rel. Evans*, 936 F.2d at 476, as

"such ultimate conclusions would not be helpful to the jury and would improperly intrude

on its fact-finding function."  *O'Sullivan*, 233 F. Supp. 3d at 929.  Here, Mr. Palmeri's

statements of what the law is – whether taken from the majority opinion or Justice

Coats's in *Pringle* – and whether defendant complied with the law are not permissible

opinions for an expert witness to render because such opinions are an attempt to

"define the legal parameters" of the case.  *See Specht*, 853 F.2d at 808–810

(Testimony that "articulates the ultimate principles of law governing the deliberations of

the jury" is inadmissible.). The Court will therefore exclude both (1) Mr. Palmeri's

opinion about whether physical impairment and disfigurement are separate categories

of damages, i.e., what *Pringle* means, which is a statement of the law for the Court to

provide the jury, and (2) Mr. Palmeri's conclusion about whether defendant's treatment

of general damages to include both non-economic loss and impairment complied with

*Pringle* and other caselaw.

### 2. *Fair Debatability and Defendant's Obligations*

Second, plaintiff seeks to exclude Mr. Palmeri's opinion that, because plaintiff's

claim was fairly debatable, it was reasonable for defendant to deny plaintiff's additional

payments.  Docket No. 29 at 4.  Plaintiff argues that Mr. Palmeri's opinion is

contradicted by Colorado caselaw, which holds that "[f]air debatability . . . is not a

threshold inquiry that is outcome determinative as a matter of law, nor is it the

beginning and the end of the analysis in a bad faith case."  *Id.* at 4 (quoting *Schultz v.

GEICO Cas. Co.*, 429 P.3d 844, 848 (Colo. 2018) (quoting *Sanderson v. Am. Fam. Mut.

Ins. Co.*, 251 P.3d 1213, 1218 (Colo. App. 2010)).  Plaintiff states that *Sanderson* held,

"in defending a fairly debatable claim, an insurer must exercise reasonable care and

good faith."  *Id.* at 4–5 (quoting *Sanderson*, 251 P.3d at 848 (citation omitted)).  In other

words, plaintiff argues that, even if plaintiff's claim were fairly debatable, defendant was

not thereby "inoculate[d]" from liability.  *Id.* at 5.  In response, defendant argues that Mr.

Palmeri opined that "[i]t is reasonable for an insurer to challenge claims that are fairly

debatable," which is consistent with Tenth Circuit caselaw.  Docket No. 36 at 7 (quoting

Docket No. 36-2 at 13).

Defendant is correct that it is reasonable for an insurer to challenge claims that are "fairly debatable." *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011); *Thompson v. State Farm Mut. Auto. Ins. Co.*, 457 F. Supp. 3d 998, 1003 (D. Colo. 2020). However, fair debatability is not "necessarily sufficient to defeat a bad faith claim as a matter of law." *Sanderson*, 251 P.3d at 1217. "[I]n defending a fairly debatable claim, an insurer must exercise reasonable care and good faith." *Id.* at 1218 (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 995 P.2d 276, 279 (2000)). Although a finding that an insurer's justification for delay or denial was fairly debatable "weighs against a finding that the insurer acted unreasonably . . . , 'fair debatability is not a threshold inquiry that is outcome determinative as a matter of law.'" *Vaccaro v. Am. Fam. Ins. Grp.*, 275 P.3d 750, 759–60 (Colo. App. 2012) (quoting *Sanderson*, 251 P.3d at 1218).

While plaintiff is correct that fair debatability is not outcome determinative, the Court will permit Mr. Palmeri to testify why, in his opinion, plaintiff's claim was fairly debatable and that it was therefore consistent with industry standards for defendant to challenge plaintiff's claim. To the extent Mr. Palmeri's opinion is that, because plaintiff's claim was fairly debatable, defendant cannot be liable, the Court will exclude such testimony both because such a statement is an opinion on an ultimate legal issue in the case and because an expert may not apply legal standards from caselaw to state an opinion that defendant's conduct actually violated or complied with caselaw. *See A.E. ex rel. Evans*, 936 F.2d at 476.

In his reply brief, plaintiff cites additional statements by Mr. Palmeri that he finds

objectionable, including that "at minimum, plaintiff's wage loss claim was fairly debatable" and that "[d]efendant's conduct was reasonable because [plaintiff's] claim, 'at minimum, was fairly debatable.'"  *See* Docket No. 37 at 4 (quoting Docket No. 29-1 at 15, 16).  Plaintiff, however, did not identify these specific statements in his motion. Generally, a moving party waives an issue by failing to raise it in a motion.  *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("[A] party waives issues and arguments raised for the first time in a reply brief." (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)).  Therefore, the court will not consider them.

### 3. *Defendant's Obligation to Issue Payment for Undisputed Benefits*

Third, plaintiff seeks to exclude Mr. Palmeri's opinion that defendant had no obligation to issue payment for undisputed benefits prior to litigation.  Docket No. 29 at 6.  Specifically, plaintiff objects to Mr. Palmeri's statement that defendant's "adjuster [] advised plaintiff's counsel of the evaluation and tendered payment for the amount at issue, even though it had no obligation to do so."  *Id.* (quoting Docket No. 29-1 at 14). Plaintiff argues that the statement that defendant had no obligation to pay undisputed benefits is contradicted by *Fisher*, which requires that an insurer pay undisputed benefits even if other portions of the claim are disputed.  *Id.*

In response, defendant argues that *Fisher* payments are to compensate plaintiffs for past treatments, not for future medical expenses or benefits.  Docket No. 36 at 10–11.  Defendant states that plaintiff's demand letter claimed that he incurred $37,775.75 in past medical expenses and $198.46 in medical mileage, which are not in dispute; however, because defendant already received $50,000.00 from the other

14

driver's insurer, defendant was never obligated to make payment for the past medical expenses or medical mileage.  *Id.* at 11.  Because plaintiff's remaining claims for future medical expenses, lost wages, and general damages were not undisputed, defendant insists that it had no obligation under *Fisher* to render payment.  *Id.*  Nevertheless, defendant states that it has extended plaintiff $30,665.03 notwithstanding that plaintiff's undisputed expenses were already covered.  *Id.*  In reply plaintiff argues that *Fisher* is not limited to undisputed past benefits but applies to all covered benefits.  Docket No. 37 at 8–9.

The Court agrees with plaintiff.  *Fisher* applies to undisputed covered benefits and is not limited solely to past medical benefits.  While the undisputed benefits in *Fisher* involved medical expenses, the court's ruling was not so limited.  *See Fisher*, 418 P.3d at 502 ("We must decide whether auto insurers have a duty to pay undisputed portions of a UIM claim – like the medical expenses at issue here – even though other portions of the claim remain disputed. . . . We hold that insurers have a duty not to unreasonably delay or deny payment of covered benefits, even though other components of an insured's claim may still be reasonably in dispute.").  For this reason, the Court finds defendant's reliance on *Meumann v. Peerless Indem. Ins. Co.*, No. 19-cv-03554-CMA-KMT, 2020 WL 4016111, at *2 (Colo. July 15, 2020), to be misplaced. Defendant reads *Meumann* for the proposition that *Fisher* only applies to past medical expenses because the court in *Meumann* stated that "the *Fisher* payment encompasses those payments made for treatments occurring in the past; it does not factor in any future medical expenses or benefits owed, which were not medical

15

billings."  Docket No. 36 at 10–11 (quoting 2020 WL 4016111, at *2).  But *Meumann* applied *Fisher* only to past medical expenses because those were the undisputed expenses at issue in that case.  Before the passage that defendant cites, the court explained, "the *Fisher* payment in this case is clearly based on medical billing already accrued and submitted by [p]laintiff."  2020 WL 4016111, at *2.  *Meumann*, therefore, did not limit *Fisher* to only a certain class of undisputed benefits.

Moreover, the additional $30,665.03 that defendant extended to plaintiff were not disputed benefits, contrary to defendant's argument.  As plaintiff states in reply, defendant characterized the $30,665.03 as the "undisputed amount of the underinsured motorist bodily injury settlement."  *See* Docket No. 37 at 8 (quoting Docket No. 37-6 at 1 (referring to previously issued settlement checks of $18,855.60 and $11,809.43, which together amount to $30,665.03)).  Because that amount was undisputed, defendant was obligated, under *Fisher*, to pay it to plaintiff.  Thus, Mr. Palmeri's statement that defendant "tendered payment . . . even though it had no obligation to do so," Docket No. 29-1 at 15, is incorrect and must be excluded because the Court finds that the probative value of such testimony is substantially outweighed by a danger of confusing the issues and misleading the jury and will therefore exclude the testimony under Federal Rule of Evidence 403.

### B.  Damian Arguello

Defendant moves to exclude the testimony of plaintiff's legal expert, Damian Arguello, pursuant to Rule 702.  Docket No. 30.  As an initial matter, defendant's motion fails to fully comply with the Court's Practice Standards, which state that a Rule 702

16

motion "shall identify with specificity each **opinion** the moving party seeks to exclude."
Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.G.  While
defendant provides a number of statements of Mr. Arguello in the background section
of its motion, defendant does not identify these "statements" as the opinions it seeks to
exclude under Rule 702.  *See* Docket No. 30 at 2–4.  Moreover, defendant improperly
seeks to exclude the entirety of Mr. Arguello's testimony, rather than opinions it believes
are improper.  *See id.* at 11 ("[Defendant] respectfully moves this Court to exclude the
testimony of Mr. Arguello pursuant to Federal Rule of Evidence 702").  The Court will
construe defendant's motion as a challenge to those opinions that its motion reasonably
identifies.  These opinions broadly fall into three categories: (1) opinions about
defendant's post-litigation conduct, which defendant argues are irrelevant, unhelpful,
and inadmissible; (2) opinions about defense counsel's post-litigation conduct, which
defendant argues are irrelevant, unhelpful, and inadmissible; and (3) opinions about
ultimate conclusions for the jury to reach.  *Id.* at 5–11.  The Court considers these
arguments in turn.

### 1.  *Defendant's and Defense Counsel's Post-Litigation Conduct*

Defendant argues that, although Mr. Arguello acknowledges that defendant had
no duty to negotiate a settlement once an adversarial proceeding like this lawsuit
began, Mr. Arguello opines that defendant "nevertheless has a legal and standard
insurance duty to continue to evaluate [plaintiff's] claim" after the filing of the case and
defendant's "refusal to do so in the face of clear liability of such benefits at a
reasonable amount is unreasonable, and [defendant] is recklessly disregarding that

unreasonableness in maintaining this litigation." *Id.* at 7 (quoting Docket No. 30-2 at 35). Defendant claims that Mr. Arguello's statement is incorrect and must be excluded to prevent confusion, delay, and prejudice because evidence of an insurer's post-litigation conduct is "generally . . . inadmissible, as it lacks probative value and carries a high risk of prejudice." *Id.* at 6 (quoting *Toy v. Am. Fam. Mut. Ins. Co.*, No. 12-cv-01683-PAB-MJW, 2014 WL 485922, at *2 (D. Colo. Feb. 6, 2014)) (citation omitted). Similarly, although defendant does not identify a particular opinion that it seeks to exclude, defendant argues that Mr. Arguello's "attacks on [defendant's] counsel are entirely irrelevant to [p]laintiff's claims for breach of contract, bad faith, and unreasonable delay or denial of insurance benefits." *Id.* at 7.

An insurer's "duty of good faith and fair dealing continues unabated during the life of the insurer-insured relationship, including through a lawsuit or arbitration between an insured and the insurer." *Sanderson*, 251 P.3d at 1217. However, the insurer's duty to negotiate a settlement may be suspended when two conditions are met: (1) a genuine disagreement as to the value of an insured's claim; and (2) the initiation of adversarial proceedings. *Id.*; *Bucholtz v. Safeco Ins. Co. of Am.*, 773 P.2d 590, 592–93 (Colo. App. 1988) (holding that insurer's duty to continue to negotiate settlement ceased upon insured's demand for arbitration). The parties appear to agree that both of these conditions are met, namely, there is a genuine disagreement as to the value of plaintiff's claim, and adversarial proceedings began when plaintiff filed this lawsuit.

An insurer's conduct after the commencement of adversarial proceedings can be admissible and relevant to an insurer's duty of good faith, provided the proponent of

such evidence makes a sufficient showing of relevance.  *See Rabin v. Fidelity Nat'l Property & Cas. Ins. Co.*, 863 F. Supp. 2d 1107, 1116 (D. Colo. 2012).  Where a plaintiff seeks to introduce evidence of specific conduct that is related to and occurred during litigation, plaintiff must make a specific showing of "extraordinary facts."  *Parsons v. Allstate Ins. Co.*, 165 P.3d 809, 819 (Colo. App. 2006); *see, e.g.*, *Tait v. Hartford Underwriters Ins. Co.*, 49 P.3d 337, 343 (Colo. App. 2001) (holding that trial court properly considered defendant's litigation tactics when calculating exemplary damages).  This is because "[e]vidence of [an insurer's] conduct carries a substantial danger of unfair prejudice and jury confusion," as "[d]etermining whether [an insurer's] conduct was evidence of bad faith would require the parties to explain to the jury the procedural aspects and merits of the [litigation] proceeding."  *Toy*, 2014 WL 485922, at *4 (citing *Rabin*, 863 F. Supp. 2d at 1118).  "Counsel on both sides may also be called to testify," which would "create confusion and unnecessarily lengthen the trial" and "defendant would suffer unfair prejudice by being forced to chose between revealing information protected by attorney-client privilege in order to justify its arbitration strategy or allowing plaintiff's evidence to go uncontested."  *Id.*

Therefore, in order to be admissible, evidence of litigation conduct must pass a Rule 403 balancing test, with particular scrutiny placed on the proponent's showing of probative value.  *See Parsons*, 165 P.3d at 819.  In the context of bad faith claims, where the focus is "the insurer's knowledge and belief during the time the claim is being reviewed, . . . the relevance of litigation conduct is severely diminished."  *Timberlake Constr. Co v. U.S. Fidelity and Guar. Co.*, 71 F.3d 335, 340 (10th Cir. 1995) (internal

quotation marks omitted) (applying Oklahoma law and holding that trial court erred in admitting evidence of a post-litigation letter from insurer's counsel to insurer's adjuster, evidence that insurer filed a counterclaim, and evidence that insurer moved to join necessary party).  Although an insurer's litigation conduct may be admissible in rare instances, "such evidence will generally be inadmissible, as it lacks probative value and carries a high risk of prejudice."  *Id.* at 341; *see, e.g.*, *Rabin*, 863 F. Supp. 2d at 1117–1118 (excluding evidence of an insurer's attempt to assert counterclaims upon a finding that such evidence was "more benign and less probative of bad faith and a section 1116 violation").  This Court has previously noted that "evidence of a defendant insurance company's litigation conduct is admissible only if 'the risks of unfair prejudice, confusion of the issues, or misleading the jury, and considerations of undue delay, waste of time, or the presentation of unnecessary cumulative evidence are substantially outweighed by the probative value of the evidence.'"  *Etherton v. Owners Ins. Co.*, No. 10-cv-00892-PAB-KLM, 2013 WL 68702, at *6 (D. Colo. Jan. 7, 2013) (quoting *Parsons*, 165 P.3d at 818).  "Admitting a defendant insurer's litigation strategy as evidence of its bad faith 'could create potential conflicts with the attorney's litigation privilege,' 'result in ethical dilemmas for attorneys representing insurance companies.'"  *Id.* (quoting *Parsons*, 165 P.3d at 817).  "It could also deter insurers 'from conducting a vigorous defense.'"  *Id.* (quoting *Parsons*, 165 P.3d at 819).

To begin, the Court will permit Mr. Arguello to testify, consistent with his expertise in the field of insurance industry standards, that, while defendant's duty to negotiate or settle plaintiff's claim ended once plaintiff filed this lawsuit, defendant's duty of good faith did not.  Mr. Arguello may also testify, in his opinion, what the duty of

good faith entails, that defendant's conduct was not consistent with this duty, and how, as a factual matter, defendant's conduct was inconsistent with that of a reasonable insurer.  While testimony about how a reasonable insurer would have dealt with new information provided after litigation has commenced relates to plaintiff's claim that defendant acted in bad faith by not continuing to adjust his claim, such testimony is not relevant because insurers do not have a duty to negotiate genuinely contested issues after the commencement of adversarial proceedings.  *See Baker v. Allied Prop. & Cas. Ins. Co.*, 939 F. Supp. 2d 1091, 1109 (D. Colo. 2013); *Rabin*, 863 F. Supp. 2d at 1113. Mr. Arguello therefore may not testify that defendant had a post-litigation duty to continue to adjust and settle plaintiff's claim, except where the amounts claimed were not in dispute.  *See Fisher*, 418 P.3d at 502; *Leeper v. Allstate Fire & Cas. Ins. Co.*, No. 13-cv-03460-PAB-KMT, 2015 WL 4197079, at *2 (D. Colo. July 13, 2015) (explaining that *Fisher* rejected the insurer's "position that its failure to pay its insured policy benefits once the case had been filed could not have been unreasonable . . . because the amount of [the plaintiff's] entire [] claim was 'fairly debatable'").

This is not the same as plaintiff's argument that, "[b]y involving its counsel in the adjustment and evaluation of this claim, [d]efendant uses the attorney-client privilege to shield itself from any investigation into the discharge of its duties to the [p]laintiff" and has thereby "conflated the role of litigator and adjustor."  Docket No. 35 at 11.  While plaintiff argues that Mr. Arguello's comments on this issue "only touch on the conduct of counsel to the limited extent that they reflect the conduct of [d]efendant," *id.*, the Court will exclude these opinions.  Mr. Arguello may not testify about defendant's litigation strategy, including defendant's "frivolous" removal of this matter to federal court;

21

demand that plaintiff "forfeit rights as a prerequisite to remanding" the case back to state court; refusal to sit for a Rule 30(b)(6) deposition, which appears to have been resolved, *see* Docket No. 35-9 (transcript of Rule 30(b)(6) representative deposition); voluminous document requests; or audit of plaintiff's tax returns, which plaintiff argues in his summary judgment motion defendant failed to do; "filed a motion on dubious grounds"; and retained an expert to provide a false description of Colorado law in an attempt to ignore information that benefits plaintiff's claim.   *See* Docket No. 35 at 9, 12. As the Court has noted, admitting testimony regarding litigation strategy as evidence of bad faith risks creating "ethical dilemmas for attorneys representing insurance companies" or "conflicts with the attorney's litigation privilege" and plaintiff has shown no "extraordinary facts" to outweigh the risk of unfair prejudice or jury confusion.  *See Parsons*, 165 P.3d at 817–19; *Toy*, 2014 WL 485922, at *4.  In addition, insurers might be "deterred from conducting a vigorous defense" if their selection of experts could be used as "evidence of pre-existing bad faith."  *Parsons*, 165 P.3d at 819.  Moreover, such statements contradict prevailing Colorado law, which recognizes that an insurer challenging a claim for UIM coverage may find itself in a quasi-adversarial position with respect to its insured.  *See State Farm Mut. Auto. Ins. Co. v. Brekke*, 105 P.3d 177, 188 (Colo. 2004) ("the insurer becomes almost adversary to its own insured in the context of uninsured motorist coverage").[3]

---

[3] Plaintiff argues that the Denver District Court already considered this issue in granting plaintiff's motion to amend.  Plaintiff states, "Judge Jones granted that Motion, finding [d]efendant's litigation conduct was 'relevant and likely admissible.'"  Docket No. 35 at 2 (quoting Docket No. 35-2 at 1).  Plaintiff does not argue that the Court should give preclusive effect to the Denver District Court's order on this issue, and the Court will not do so, as it is not clear that the Denver District Court considered issues of

### 3. Ultimate Issues of Law

Finally, defendant argues that Mr. Arguello intends to state "an ultimate conclusion (in his opinion) on the result he believed the jury should reach." Docket No. 30 at 9. An expert's opinion is not "objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). The Tenth Circuit has held that an expert witness may testify regarding an ultimate issue of fact, but may not offer an opinion that "articulates the ultimate principles of law governing the deliberations of the jury." *Specht*, 853 F.2d at 808; *O'Sullivan*, 233 F. Supp. 3d at 928 (permitting an insurance expert to offer his opinions on relevant industry standards, but not permitting the expert to opine on whether the insurance company met any legal standard). An expert witness may not "state legal conclusions drawn by applying the law to the facts." *A.E. ex rel. Evans*, 936 F.2d at 476.

The rationale for excluding testimony on ultimate legal issues is that legal conclusions do not "assist[] the jury's understanding and weighing of the evidence," but rather "direct a verdict," creating a risk of both confusion and prejudice. *Specht*, 853 F.2d at 808–09; *see also Wollan v. U.S. Dep't of Interior*, 997 F. Supp. 1397, 1403 (D. Colo. 1998) ("Where the ultimate issue is a question of law, the opinion of a legal expert, even a lawyer, interferes with the judge's role as 'sole arbiter of the law' and should not be allowed.") (citing *Specht*, 853 F.2d at 807–810). This rule applies to "an attorney who states his belief of what law should govern the case." *Specht*, 853 F.2d at

---

admissibility in the context of Rule 702, the conflicts that could come with admitting evidence of defense counsel's litigation conduct, or the differences in admitting evidence of defendant's post-litigation conduct compared with defense counsel's post-litigation conduct.

808; *see also Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 742 (10th Cir. 1993) (stating that a critical factor in *Specht* was that the witness was an attorney seeking to testify about constitutional law).

In *Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1107 (Colo. App. 1990), the court held that it was not error under Colorado Rule of Evidence 702 to permit two attorneys to testify as expert witnesses regarding the "standard of good faith conduct of an insurer," noting that "[e]xperts routinely testify as to whether a defendant's conduct violated the accepted standards of practice of the legal, medical, dental and engineering professions." It held that the attorneys' years of experience dealing with insurance companies regarding worker's compensation claims constituted an "adequate foundation to demonstrate the expert witnesses' familiarity with and knowledge of insurance industry standards in meeting the companies' responsibilities to injured workers." *Id.* at 1106. The court further held that the attorneys could articulate a reasonableness standard drawn from caselaw and apply it to a defendant insurance company's conduct. *Id.* at 1107. The court reasoned that this testimony was not prejudicial or confusing because the witnesses applied the same standard stated in the jury instructions and because the judge reminded the jury during the expert's testimony to apply only the legal rules announced by the judge. *Id.*

Defendant specifically identifies the following statements: (1) defendant "failed to effectuate a reasonable and equitable settlement once liability was clear," Docket No. 30 at 10 (quoting Docket No. 30-2 at 32); (2) defendant "recklessly or intentionally undervalued [plaintiff's] claim," *id.* (quoting Docket No. 30-2 at 33); (3) defendant "has

systematically undervalued [plaintiff's] benefit for his physical impairment," *id.* (quoting Docket No. 30-2 at 34); (4) "a reasonable estimate of [plaintiff's] lost income and physical impairment easily exceed the amount of UIM benefits remaining on his policy," *id.* at 10–11 (quoting Docket No. 30-2 at 35); (5) defendant "acted unreasonably in handling [plaintiff's] claim, acted with willful or reckless disregard for the unreasonableness of its conduct, information supporting payment of benefits, and [plaintiff's'] rights" *id.* at 11 (quoting Docket No. 30-2 at 35–36); and (6) defendant "delayed payment of covered benefits to [plaintiff] without a reasonable basis." *Id.* (quoting Docket No. 30-2 at 36).

The first, second, fifth, and sixth statements contain legal conclusions, for example, that defendant's conduct was unreasonable and that defendant acted willfully and recklessly. These opinions would impermissibly usurp the role of the judge in stating the law and the role of the jury in applying the law to the facts. *See Specht*, 853 F.2d at 808–09; *A.E. ex rel. Evans*, 936 F.2d at 476. The Court will therefore exclude these statements. The Court will also exclude the fourth statement. While the Court will permit Mr. Arguello to testify which standard a reasonable insurer would use to calculate an insured's impairment, the Court will exclude Mr. Arguello from testifying that a reasonable insurer would have reached a different estimate of plaintiff's damages, as plaintiff has not endorsed Mr. Arguello to testify on the issue of damages, and he does not appear qualified to do so. The Court will not exclude the third statement, but will exclude Mr. Arguello from providing calculations or estimates of the value of plaintiff's claim.

25

## C.  Dr. Jack Rentz

Defendant also seeks to exclude the testimony of plaintiff's treating physician, Dr. Rentz, on issues of future medical treatment.  Docket No. 31 at 1.  Defendant argues that plaintiff's disclosure of Dr. Rentz as an expert to opine on plaintiff's future medical treatment fails to satisfy the requirements of Rule 26(a)(2)(B)(i)–(vi) and is both unhelpful to the jury and unreliable under Rule 702.  Docket No. 31 at 4.  Plaintiff disputes that Dr. Rentz's opinions are limited to plaintiff's future medical care, that he was required to provide an expert report under Rule 26(a)(2)(B), or that his opinions are inadmissible.  Docket No. 33 at 6–8.

Dr. Rentz's records indicate that plaintiff visited his practice, Denver Diagnostic Pain Corporation, three times, on April 9, 2018, April 23, 2018, and May 21, 2018.  *See* Docket No. 31-2.  There is also a record for medial branch injections on April 23.  *Id.* at 15–16.  Dr. Rentz's records for the visit on April 9 and May 21 mention that Dr. Rentz reviewed MRIs of plaintiff's cervical spine and thoracic spine.  *Id.* at 5, 11.  The records for those dates also contain the following paragraph:

> It is my opinion, within a reasonable degree of medical certainty, that the objective and quantitative findings as described above and additionally in the patient file, include physical bodily damage and limitations which are a direct result of the injury caused on November 15, 2017.[4]  The injuries are consistent with the patient's reported history of the collision.

*Id*.  The records for April 9 discuss scheduling bilateral "Thoracic MBB Injections T6-7, T7-8" as well as left-side "Cervical Facet Injections C5-6, C6-7."  *Id.* at 5–6.  The records also mention considering additional thoracic and cervical facet injections.  *Id.* at

---

[4] The undisputed facts indicate that the collision occurred on November 18, 2017.  *See* Docket No. 41 at 2, ¶ 1.

6.  The May 21 records discuss scheduling "Cervical MB RFTC C5-6, C6-7" and considering thoracic and cervical facet injections.  *Id.* at 11.

Dr. Rentz later prepared an undated two-page "narrative report" containing opinions on the "fundamentals of [plaintiff's] mechanism of injury, pathology related to the mechanism, and treatments currently and ongoing in the future."  Docket No. 31-5 at 1.  The narrative report states that plaintiff's "injury received in the collision of November 18, 2017, is an acceleration-deceleration injury which occurred to the upper cervical and mid thoracic spine" and was a "direct result" of the collision, in which "forces were applied causing excessive motion and unintended motion to the cervical and thoracic spine, which injured the spinous ligamentous structures and the axial facet joints bilaterally."  *Id.*  Dr. Rentz states that MRI findings confirm this "acceleration-deceleration injury" and that plaintiff presented with "[s]mall right foraminal disc protrusion at C3-C4, which protrusions have history of well documentation to be an acute finding due to an acceleration-deceleration injury."  *Id.*  Dr. Rentz states that he could not find a more probable explanation for plaintiff's symptoms aside from the collision, that plaintiff's injuries are "permanent . . . , although adequate treatment has occurred."  *Id.* at 1–2.  Dr. Rentz concludes that plaintiff will need "continued left facet injections . . . , bilateral medial branch blocks . . . , which may include also radiofrequency treatments . . . every 6-12 months for perpetuity until a surgical fusion or fixation will be required."  *Id.* at 2.

### 1.  Rule 26(a)(2)(B)

In order for Dr. Rentz to state opinions at trial without submitting a Rule

26(a)(2)(B) report, plaintiff must demonstrate that Dr. Rentz is properly designated as a non-retained witness under Rule 26(a)(2)(C).

Defendant argues that, because Dr. Rentz was disclosed to opine on "*future medical treatment* – i.e., causation, prognosis, and future disability – plaintiff was required to submit a report" consistent with Rule 26(a)(2)(B).  Docket No. 31 at 5.  Rule 26(a)(2)(B) provides that if a "witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," the party offering the witness must supplement its disclosure with an expert report.  For other witnesses, Rule 26(a)(2)(C) applies and the disclosure need only state "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).

Defendant identifies three objectionable statements from Dr. Rentz's narrative report: (1) on causation: "I could not find any other more probable explanations for the cause of the patient's symptoms and diagnoses aside from the collision," *id.* at 6 (quoting Docket No. 31-5 at 1); (2) on prognosis: "[d]ue to the acceleration-deceleration injury, [plaintiff] is at risk of traumatic arthritis and a more rapid deterioration of the facet joints and ligamentous structures and cervical spine and thoracic spine structure, which have been affected by this accident," *id.* (quoting Docket No. 31-5 at 2); (3) on future disability: "[plaintiff] may also have increased instability, which may need surgical fusion at levels C3-4 ACDF or correction in the future.  As well, acute and/or on top of chronic axial back pain, decreased range of motion, facetogenic arthritis which is more

28

aggressive and early onset." *Id.* at 6–7 (quoting Docket No. 31-5 at 2).  Defendant

argues that Dr. Rentz's "opinions . . . are extensive in nature," but that "the disclosure of

information concerning these opinions is not." *Id.* at 7.  Defendant concludes that,

because Dr. Rentz did not issue a report compliant with Rule 26(a)(B), defendant has

suffered unfair prejudice. *Id.* at 7–8.

As the Court has noted, treating physicians are typically non-retained experts

and therefore are not subject to Rule 26(a)(2)(B)'s report requirement.  *See Seeley v.*

*Home Depot U.S.A., Inc.*, No. 17-cv-00584-PAB-NYW, 2018 WL 4275375, at *1 (D.

Colo. Sept. 7, 2018); *Goodman v. Staples the Off. Superstore, LLC*, 644 F.3d 817, 819,

824 (9th Cir. 2011) ("Generally, a treating physician is not retained or specially

employed to provide expert testimony . . . and therefore he is not subject to the written

report requirement." (citation omitted)).  However, when "a treating physician . . . is

offered to provide expert testimony as to the cause of the plaintiff's injury, but . . . did

not make that determination in the course of providing treatment," the physician "should

be deemed" to be an expert covered by Role 26(a)(2)'s report requirement.  *Meyers*,

734–35; *see also Seeley*, 2018 WL 4275375, at *1; *Goodman*, 644 F.3d at 819, 824–25

(holding that when a treating physician is "transformed into an expert offering testimony

on matters beyond the treatment rendered," Rule 26 requires the physician to submit a

report).

Defendant, therefore, is correct that opinions going beyond Dr. Rentz's personal

observation and treatment of plaintiff are subject to the requirements of Rule

26(a)(2)(B).  *See Witherspoon v. Navajo Refining Co.*, *L.P.*, 2005 WL 5988650, at *1

(D.N.M. June 28, 2005) ("Under Tenth Circuit law, treating physicians not disclosed as experts are limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient."); *see also Goodman*, 644 F.3d at 826 ("a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment").  However, a treating physician's opinions need only satisfy two requirements to avoid the sweep of Rule 26(a)(2)(B): (1) they "must have been determined at the time of treatment" based on the physician's personal knowledge; and (2) they must be properly disclosed under Rule 26(a)(2)(C).  *Seeley*, 2018 WL 4275375, at *3.

The Court begins by noting that the fact Dr. Rent'z testimony "may touch on issues such as causation and prognosis does not automatically subject those opinions to the requirements of Rule 26(a)(2)(B)."  *Id.* at *2 n.3; *see also Goodman*, 644 F.3d at 825 ("a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment"); *Meyers*, 619 F.3d at 734–35.  Rather, as courts in this district have explained, "the rationale for permitting a treating physician to testify on the basis of his or her personal knowledge and treatment of a patient 'extends to treating physician opinions regarding causation and prognosis.'"  *Seeley*, 2018 WL 4275375, at *3 (quoting *Trejo*, 2007 WL 2221433, at *1)). The Court will therefore preclude Dr. Rentz from testifying on matters outside of his personal knowledge and will prohibit him from testifying about diagnoses, treatment, records, or prognoses by other providers unless, at the time of treatment, he took information from other providers into account in

reaching his conclusions.  *See Goodman*, 644 F.3d at 826 (holding that opinions of physicians "specifically retained . .  to render expert testimony beyond the scope of the treatment," who "to form their opinions, . . .  reviewed information provided by [plaintiff's] attorney that they hadn't reviewed during the course of treatment" should be excluded); *Meyers*, 619 F.3d at 734–35 (excluding testimony of physicians who "prepared letters with opinions as to the causation of [plaintiff's] injuries at the request of [his] attorney, specifically for the purpose of litigation" because plaintiff "presents no evidence, and [the court] find[s] none in the record, suggesting that either doctor previously considered or determined the cause of [plaintiff's] injuries during the course of treatment").

As to Dr. Rentz's opinions about causation, the Court notes that establishing injury causation requires a showing of both general and specific causation.  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005).  "General causation" refers to whether the accident in question is, in the abstract, capable of producing the type of injury suffered.  *Id.*  General causation may be established by such things as epidemiological evidence, *id.*, but an expert is not required to cite published studies "in order to reliably conclude that a particular object caused a particular illness."  *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1211 (10th Cir. 2002) (citing *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000)).  "Specific causation" refers to whether a particular accident or substance caused the specific injury at issue.  *Id.*  Once a party has established general causation, differential diagnosis may be admissible to prove specific causation.  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003).  "'Differential diagnosis' refers to the process by which a physician

'rules in' all scientifically plausible causes of the plaintiff's injury.  The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Hollander*, 289 F.3d at 1209 (internal citations and alterations omitted).  A differential diagnosis is admissible even if the expert does not "explicitly rule out" every possible alternative cause.  *Goebel*, 346 F.3d at 999.  Although an expert may not rely solely on temporality to establish specific causation, temporality may be used as one factor "taken into account in considering causation."  *Watson v. Dillon Cos., Inc.*, 797 F. Supp. 2d 1138, 1155 (D. Colo. 2011).

In *Seeley*, this Court found an expert's methodology – "reviewing descriptions of the . . . accident contained in plaintiff's medical records and deposition testimony" – to be sufficient for general causation because, based on those descriptions, the expert "determined that such an accident was capable of producing [the plaintiff's] injuries" after the expert "reviewed [the plaintiff's] medical records to rule out alternative causes of [the plaintiff's] injuries, including degenerative change [and] other possible sources of trauma."  *Seeley*, 2018 WL 4275375, at *9.  Here, the Court finds that Dr. Rentz's treatment records do not adequately establish general causation, i.e., that the accident in question is capable of producing the type of injury that plaintiff suffered.  Dr. Rentz's records state that plaintiff was referred to him after a motor vehicle accident that occurred in November 2017 and that plaintiff's MRI records are consistent with his reported symptoms and physical exam findings, but Dr. Rentz's records do not contain any description of the accident or description of how the accident allegedly caused plaintiff's injuries.  *See* Docket No. 31-2 at 3, 5, 9; *see also Seeley*, 2018 WL 4275375,

at *10 (finding accident descriptions in plaintiff's medical records sufficient to enable physician to formulate an opinion as to general causation where plaintiff's records mentioned at least twice that plaintiff "[w]as at Home Depot and forklift hit his cart in aisle and pinned his knee" and a Home Depot "employee started the forklift and it hit [plaintiff's] cart," which hit plaintiff in the hip (citation omitted)); *Hollander*, 289 F.3d at 1211 (a physician need not cite published studies "in order to reliably conclude that a particular object caused a particular illness"); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262–66 (4th Cir. 1999) ("a reliable differential diagnosis alone may provide a valid foundation for a causation opinion").  Moreover, while Dr. Rentz's "narrative report" provides additional opinions, *see* Docket No. 31-5, the Court declines to consider the undated report because plaintiff does not dispute that it was prepared for litigation, and the opinions exceed what is mentioned in Dr. Rentz's medical records.  *See Davis*, 2012 WL 882405, at *2 (precluding physician from testifying, without a written report, about opinions developed outside of the physician's treatment of the patient "because there is a lawsuit").[5]

The Court further finds that Dr. Rentz's narrative report is not merely an elaboration of the same opinions in his medical records.  As mentioned previously, Dr. Rentz's medical records indicate that he reviewed MRI results and provide a general opinion on causation, which is that the "objective and quantitative findings as described [earlier in the records] and additionally in the patient file, include physical bodily damage

---

[5] The Court need not consider the issue of specific causation because Dr. Rentz has not shown general causation and establishing injury causation requires a showing of both general and specific causation.  *See Norris*, 397 F.3d at 881.

and limitations which are the direct result of the injury caused."  Docket No. 31-2 at 5,
11.  Plaintiff's patient file is not included in the records.  *See generally id.*; *see also*
Docket No. 33-4.  Dr. Rentz's records also mention injections that plaintiff is to schedule
or consider.  *See* Docket No. 31-2 at 5–6, 10–11.

Dr. Rentz's narrative report, however, provides a new, more specific opinion on
causation, including that the "acceleration-deceleration injury . . . occurred to the upper
and mid thoracic spine" as a direct result "of the injury . . . in which forces were applied
causing excessive motion and unintended motion to the cervical and thoracic spine."
Docket No. 31-5 at 1.  Dr. Rentz also opines that "right foraminal disc protrusion at
C3-C4, which protrusions have history of well documentation to be an acute finding due
to an acceleration-deceleration injury."  *Id.*  Dr. Rentz states that he performed a
"diagnosis of exclusion" and notes that he "could not find any more probable
explanations for the cause of [plaintiff's] symptoms and diagnoses aside from the
collision."  *Id.*  He also states that plaintiff had no history of "seeking medical
professional help of the cervical spine."  *Id.*  Moreover, Dr. Rentz opines on plaintiff's
"physical restrictions from the incident" and states that plaintiff "is at risk of traumatic
arthritis and a more rapid deterioration of the facet joints and ligamentous structures
and cervical spine and thoracic spine structures, which have been affected by this
accident."  *Id.* at 2.  Dr. Rentz states that plaintiff "may have increased instability, which
may need surgical fusion at levels C3-4 ACDF or correction in the future" and that
plaintiff may face "acute and/or on top of chronic axial back pain, decreased range of
motion, facetogenic arthritis which is more aggressive and early onset."  *Id.*  Because

Dr. Rentz's treatment records do not support these opinions and there is no evidence that these opinions were formed during his treatment of plaintiff in April and May 2018, Dr. Rentz was required to have provided a report complying with Rule 26(a)(2) in order to offer these opinions at trial.  *See Goodman*, 644 F.3d at 826; *Meyers*, 619 F.3d at 734–35.

The Court also does not find that Dr. Rentz's narrative report complies with the retained expert standard.  Rule 26(a)(2) provides, in part, that a party's disclosure of an expert must be accompanied by a written report that contains the "facts or data considered by the witness in forming" their opinions.  *See* Fed. R. Evid. 26(a)(2)(B)(ii). Courts in this district have noted that "[i]t is sufficient . . . to provide in the expert report a listing of the data and other information considered by the expert, which must be provided or otherwise made available for inspection upon request" but that "[t]he rule does not require that all data or other information considered by the expert must be copied and physically provided with the report."  *Dolin v. Contemp. Fin. Sols., Inc.*, No. 08-cv-00675-WYD-BNB, 2009 WL 4730465, at *2 (D. Colo. Dec. 8, 2009) (citing *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1121–22 (D. Colo. 2006)).  The advisory committee notes to the 2010 amendments to Rule 26 explain that this requirement "extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert" and extends "facts or data" to "broadly . . . require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients."  Dr. Rentz's narrative report does not include a list of the facts and data that he considered.  *See* Docket No. 31-5.

Federal Rule of Civil Procedure 37(c) states, in part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  This determination "is entrusted to the broad discretion of the district court."  *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (quotation omitted).  The Tenth Circuit has identified four factors for the Court to consider in determining whether the failure to disclose is substantially justified or harmless: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability to cure the prejudice; (3) the potential for trial disruption; and (4) the non-disclosing party's bad faith or willfulness.  *Woodworker's Supply*, 170 F.3d at 993.  The Court does not find that the failure to disclose the facts and data that Dr. Rentz relied upon was either substantially justified or harmless.  Plaintiff provides no explanation for why the narrative report does not contain a list of the facts and data that Dr. Rentz considered.  Moreover, the Court finds plaintiff's failure to do so prejudices defendant's ability to effectively prepare for trial.  *See Ellsworth v. Tuttle*, 148 F. App'x 653, 663–64 (10th Cir. 2005) (unpublished).  Therefore, the Court will limit Dr. Rentz's causation opinions to only those expressed in his treatment records and based on his personal observation or treatment of plaintiff.  *See Goodman*, 644 F.3d at 826; *Meyers*, 619 F.3d at 734–35.

As to Dr. Rentz's opinions on prognosis and future disability, defendant does not provide any argument as to why it believes these opinions are outside the scope of Dr. Rentz's personal knowledge or treatment of plaintiff.  While some cases from this

district have permitted non-retained experts to testify as to prognosis, *see Carbaugh v. Home Depot U.S.A., Inc.*, No. 13-cv-02848-REB-MEH, 2014 WL 3543714, at *3 (D. Colo. July 16, 2014); *see also Washington*, 197 F.R.D. at 442, the majority of decisions require an expert report for such an opinion.  *See Kemp v. Webster*, No. 09-cv-00295-RBJ-MJW, 2012 WL 5289573, at *2 (D. Colo. Oct 26, 2012); *see also Estate of Grubbs v. Weld Cnty. Sheriff's Office*, No. 16-cv-00714-PAB-STV, 2018 WL 8838810, at *1 (D. Colo. July 20, 2018); *Dedmon v. Continental Airlines, Inc.*, No. 13-cv-0005-WJM-NYW, 2015 WL 1040521, at *5 (D. Colo. Mar. 6, 2015); *Davis*, 2012 WL 882405, at *2.  As previously explained, the report requirement is based on the fact that a treating physician's expert testimony is limited to his or her "observations, diagnosis, and treatment of a patient, i.e, 'what he [saw] and did and why he did it.'"  *Davis*, 2012 WL 882405, at *2.  Thus, Dr. Rentz may only testify as to opinions formed in his personal observation or treatment of plaintiff in April and May 2018, *see* Docket No. 31-2, and may not testify on any opinions formed based on a subsequent review of another provider's records or any other materials.  *Davis*, 2012 WL 882405, at *2; *see also Washington*, 197 F.R.D. at 442 (permitting treating physician to testify about examination, diagnosis and treatment of patient "based upon [physician's] examination of the patient or to the degree of injury in the future" because such opinions "are a necessary part of the treatment"), or any opinion that was "formed because there is a lawsuit."  *Kemp*, 2012 WL 5289573, at *2 (quoting *Davis*, 2012 WL 882405, at *2).[6]

---

[6] Defendant also argues that plaintiff failed to disclose the "anatomical charts, imaging studies, digital 3D models, physical anatomical models" or "drawings to explain the mechanism of injuries."  Docket N. 31 at 8.  The Tenth Circuit has "recognized the value of exhibits that summarize data contained in other exhibits and that present the

### 2. *Rule 702*

Defendant argues that Dr. Rentz's opinions concerning plaintiff's future medical treatment are unhelpful and unreliable under Rule 702.  Docket No. 31 at 9–11. First, defendant argues that Dr. Rentz's testimony that plaintiff needs additional treatment is irrelevant and unhelpful because it is in direct conflict with plaintiff's testimony that plaintiff has declined future medical treatment.  *Id.* at 9.  Admitting such testimony, defendant argues, could result in prejudice to defendant because the jury could award damages for treatment that plaintiff does not want or need.  *Id.* at 10.  Second, defendant argues that Dr. Rentz's testimony about future medical treatment is unreliable because, while Dr. Rentz has opined that plaintiff will need medical care in the future, Dr. Rentz provided no facts or data to support this opinion, there is no mention of surgery in his records, and he is not a surgery expert.  *Id.*

Plaintiff argues that there is no conflict between Dr. Rentz's opinion that plaintiff requires future care and plaintiff's testimony that he has not actually received this care, as "[m]edical recommendations and treatment do not always fit neatly into the deadlines imposed by litigation," and "[j]ust because [plaintiff] has not undergone

---

evidence in a 'simpler form.'"  *Dahlberg v. MCT Transp., LLC*, 571 Fed. App'x 641, 647 (10th Cir. 2014) (unpublished) (quoting *United States v. Downen*, 496 F.2d 314, 321 (10th Cir. 1974)).  Demonstrative exhibits "may be effective in illustrating relevant information to a jury, assuming a proper foundation is laid."  *Id.* at 647 (citing *Sanchez v. Denver & Rio Grande W. R.R.*, 538 F.2d 304, 306 (10th Cir. 1976)); *see also Wilson v. United States*, 350 F.2d 901, 907 (10th Cir. 1965) (affirming admission of charts as demonstrative evidence because the "evidence was involved and complicated and . . . the charts fairly and accurately summarized previously admitted competent evidence."). Because the Court has not seen the underlying evidence or the proposed demonstrative exhibits, the Court cannot determine whether a proper foundation has been laid for any demonstrative exhibit and will thus decline to rule on the admissibility of such exhibits at this time.

certain procedures, doesn't mean that he won't in the future."  Docket No. 33 at 11–12.

While plaintiff has declined additional injections and completed his medical care in 2018, *see* Docket No. 31-3 at 3–4, 92:23–93:22, testimony on the health problems and risks that plaintiff may face in the future are relevant.  Plaintiff, could, for instance, seek additional medical care if future issues arise based on the accident.  The Court will thus permit Dr. Rentz to testify, limited to his personal experience treating plaintiff, about additional pain management care that plaintiff may need.  As discussed in the preceding section, Dr. Rentz may not testify based on opinions that he may have formed outside of his treatment of plaintiff in April and May 2018.  And he may not testify about any other information or materials that he reviewed or considered after his treatment of plaintiff in order to supplement or confirm the opinions that he expresses in his own records.

Defendant also argues that Dr. Rentz's opinions are not reliable because Dr. Rentz provided no facts, data, or methodology to support his opinions.  Docket No. 31 at 10.  In response to Dr. Rentz's opinion that plaintiff may need surgery in the future, *see* Docket No. 31-5 at 2, defendant argues that this opinion is unreliable because Dr. Rentz's records do not mention surgery and Dr. Rentz is not a surgeon or surgery expert.  *Id.* at 10–11.  Therefore, defendant argues, Dr. Rentz's opinions are unreliable and speculative.  *Id.*

A district court has "broad discretion" to decide "how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability."  *Dodge*, 328 F.3d at 1223; *Kumho Tire*,

526 U.S. at 153 ("[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.").  However, the Court's role as a gate-keeper does not extend to determining whether an expert is correct.  *See Bitler*, 400 F.3d at 1233 ("a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions"); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (a plaintiff "need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community" in order to establish the admissibility of the expert's opinion under Rule 702); *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1055 (D. Colo. 2011) ("the court's 'gatekeeping' responsibilities under Rule 702 do not turn on the 'correctness' of an expert's opinions"); Wright et al., 29 *Fed. Prac. & Proc.* Evid. § 6262 (1st ed. 2013) ("[W]here expert testimony has the scientific earmarks of reliability, the judicial inquiry is over.  The courts are not to decide if the expert's opinions are, in fact, scientifically or technically correct.  The evidence is then admitted and subjected to the kind of adversarial attack that facilitates the jury's central functions of deciding what weight to attribute to evidence and what witnesses to believe.").

The Court finds that Dr. Rentz's opinions on plaintiff's risk of traumatic arthritis or a more rapid deterioration of the facet joints and ligamentous, cervical, and thoracic spine structures are not reliable because plaintiff has not shown that Dr. Rentz, an anesthesiologist, is qualified to opine on such issues.  Although a witness's qualifications are not a sufficient basis for admitting expert testimony, they constitute a

threshold requirement which, if not met, requires the exclusion of expert opinions. *See Crabbe*, 556 F. Supp. 2d at 1220. Dr. Rentz, therefore, must "stay[] within the reasonable confines of his subject area." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quotation marks and citation omitted); *see Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1093 (W.D. Okla. 2009) ("[T]he expert's qualifications must be both (i) adequate in a general, qualitative sense (i.e., 'knowledge, skill, experience, training or education' as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert."). "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston*, 275 F.3d at 970; *In re Cessna 208 Series Aircraft Products Liability Litigation*, 2009 WL 3756980, at *13 (D. Kan. Nov. 9, 2009) ("Where alleged expertise with regard to other aspects of a field gives a proffered expert no special insight into the issues of the case, such alleged expertise does not qualify the witness as an expert."). Dr. Rentz is an anesthesiologist with experience in pain management; however, there is no indication that he has any experience in orthopedics, neurosurgery, or musculoskeletal specialities that could quality him to opine on plaintiff's risk of traumatic arthritis deterioration of the spinal structures. *See* Docket No. 33-3 (curriculum vitae). While courts have implicitly recognized areas of overlap between, for instance, neurology and orthopedic medicine, *see, e.g.*, *Corneli v. Adventure Racing Co., LLC*, 2015 WL 4716285, at *6 (N.D.N.Y. Aug. 7, 2015) (finding that orthopedic surgeon had the "medical knowledge to provide an opinion regarding how Plaintiff's spine was injured in such a way to cause permanent paraplegia"); *Rafferty v. Erhard*, 2012 WL 2577473, at

41

*7 (W.D.N.Y. July 3, 2012) (rejecting argument that neurologist lacked necessary qualifications to give expert testimony contradicting orthopedic experts and finding that neurologist was "qualified to testify as to the spinal injuries and pain related to the plaintiff's claims"), plaintiff provides no indication of such overlap between anesthesiology and orthopedics, neurosurgery, or musculoskeletal specialists.  *See, e.g.*, *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 1356 (N.D. Ga. 1999) (excluding testimony of anesthesiologist on spinal fusion surgery); *Baker v. Smith & Nephew Richards, Inc.*, 1999 WL 1129650, at *2 (N.D. Ga. Sept. 30, 1999) (same); *Hickman v. Sofamor-Danek Grp., Inc.*, 1999 WL 606690, at *1 (N.D. Cal. Feb. 17, 1999) (noting that "although both of Plaintiffs' experts have experience in pain management, neither is a neurologist or orthopedist by training or practice, nor does either have skill, experience, or training in spinal surgery or spinal fixation techniques").  As such, the Court will exclude Dr. Rentz from testifying on matters outside of his area of competency and will exclude these opinions.  *See Alexander v. Smith & Nephew*, 98 F. Supp. 2d 1310, 1315 (N.D. Okla. 2000) ("[t]he simple possession of a medical degree is insufficient to qualify a physician to testify as to the advantage of a spinal fixation device, the medical causation of spine-related ailments, or the mechanical functioning of an orthopedic implantation device"); *Ralston*, 275 F.3d at 970.

### D.  Mark Guilford

Defendant next moves to exclude testimony from Mark Guilford concerning "projected expenses for future medical treatment," Docket No. 32 at 1, because Mr. Guilford's opinions are based on the narrative report submitted by Dr. Rentz and "defer

to [Dr. Rentz] as to actual frequency and duration" of treatment, *id.* at 3 (quoting Docket No. 32-3 at 1), which, defendant insists, means that Mr. Guilford's testimony is "only relevant . . . to the extent there is a competent witness to testify as to the need for [plaintiff] to obtain future medical treatment." *Id.* Absent admissible testimony from Dr. Rentz, defendant argues, testimony from Mr. Guilford about future medical expenses that was not properly disclosed under Rule 26(a)(2)(B), that contradicts plaintiff's own decision to decline future medical treatment, and that is not supported by a reliable methodology would confuse the jury and prejudice defendant. *Id.*[7]

Plaintiff responds by citing its response to defendant's motion to exclude Dr. Rentz's testimony and states that, if the Court permits Dr. Rentz to testify, defendant's motion regarding Mr. Guilford will be moot. Docket No. 34 at 1–2. Because the Court will permit Dr. Rentz to testify about what medical care plaintiff may need in the future, subject to the limitations discussed in the preceding section, the Court also will permit Mr. Guilford to testify as to the cost of that care.[8]

------

[7] Defendant argues, in passing, that, because Mr. Guilford's opinions are "predicated on undisclosed, unhelpful, and unreliable evidence, they should be excluded pursuant to F.R.E. 702." Docket No. 32 at 3–4. The Court declines to consider this argument. *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("[a]rguments raised in a perfunctory manner . . . are waived"); *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) (declining to consider argument where only a perfunctory reference to the issue was raised); *United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995) (declining to consider issues that were nominally raised).

[8] Plaintiff also states that Mr. Guilford's opinions were properly disclosed pursuant to Rule 26(a)(2)(B). *Id.* Because defendant did not argue that Mr. Guilford's report was insufficient under Rule 26(a)(2)(B), the Court declines to consider this argument in plaintiff's response.

43

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion to Strike Certain Opinions of John Palmeri [Docket No. 29] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that Defendant's Motion to Exclude Testimony of Plaintiff's Legal Expert, Damian Arguello [Docket No. 30] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that Defendant's Motion to Exclude Testimony of Treating Physician Jack Rentz, M.D. Concerning Future Medical Care [Docket No. 31] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that Defendant's Motion to Exclude Testimony of Economist Mark Guilford Concerning Future Medical Expenses [Docket No. 32] is **DENIED**.

DATED September 23, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

44